Good morning, Your Honors. Mary Chapman on behalf of the petitioner Heidi Hamilton. At this time, I would request to reserve three minutes for rebuttal. Sure. Your Honors, this is a summary judgment case in a Title VII action. And it's one in which the district court clearly, not only did they not take the evidence in the light most favorable to the plaintiff, but the district court actually ignored evidence completely and totally. In this case, Heidi Hamilton, who worked for Sears, complained of sex discrimination. And she also claimed retaliation. Now, in the arguments, the defense's approach in the district court was to divide and conquer in the evidence and to split the sex discrimination complaint into two different theories, that being the desperate treatment theory and that being the hostile working theory, with the idea of diluting the evidence by compartmentalizing them into these two types of arguments. The heart of the claim is gender discrimination, isn't it? That is correct. And hostile working ---- She thought she was treated in a demonstrably different way than her male counterparts. That is correct. And it was sex-based discrimination, which does not necessarily fall into those two categories, and which is what the plaintiff attempted to do in keeping this into a sex discrimination claim and not compartmentalizing it into a hostile work environment or desperate treatment claim, and to look at the actual totality of the evidence. And when one looks at the totality of the evidence, there's no dispute that she's part of a protected class. There really is no dispute that she's even qualified for the job. She was doing the job, and there was no indication that Sears was ever planning on firing her. There was nothing in the record that says, well, we were going to fire her had she not started in this negotiation process of leaving her employment, a negotiation that was started by her supervisor, Barry Davidson, when he said, let me pay you to find another job. She was tired of the work conditions and said, you know what, let's talk about this. I think I may accept your offer. They gave her an offer. She refused the offer, said, let me go back to work. Sears said no and terminated her at that point. I thought she resigned. Do I have that wrong? Yes, Your Honor, you do have that wrong. There was no resignation in this case. The actual factual history shows that Barry Davidson made Ms. Hamilton an offer saying, let me pay you to find a new job. That's undisputed. Ms. Hamilton contacted the human resource director and said, you know what, I'm tired of what's been happening. I think I'm going to take Barry up on his offer. They came in and said, give us your keys and everything, and we're going to give you an offer. They took her keys and removed her from the workplace prior to tendering a severance offer. When they tendered the severance offer, Ms. Hamilton reviewed it, rejected it, and said, look it, either give me a better offer or let me go back to work. Sears refused both. So that is not a resignation. That's a termination. Did at some point in time she sign the resignation? No, she never signed the resignation letter, Your Honor. There was never a resignation. Okay. I get you. The record also indicates that Ms. Hamilton's complaints to human resources in this case started prior to Barry Davidson ever issuing a single negative comment to Ms. Hamilton. Ms. Hamilton's comments to HR started in February. The first derogatory comment by Barry Davidson was not until March. Now, when you look at the totality of the evidence, you see that everything that Sears relies upon, and going through the actual claims, as I said, there's no real issue about being qualified for the position. The adverse employment actions include poor performance and negative information in her personnel file, a reduced bonus, and ultimately her termination. And then when you look at the treatment outside the class, males were not treated in this fashion or in this manner. And the evidence indicates that not only did Ms. Hamilton testify to the fact of Barry Davidson treating her differently than other male counterparts, but Irma Hill, who was a manager in the Las Vegas store, also testified. And it's interesting in that the district court, in its order for summary judgment, totally ignores Irma Hill's deposition testimony, never even considered it. Yet, when you look at Irma Hill's deposition testimony, she describes how Barry Davidson came into the stores and would ignore females, that Barry Davidson specifically ignored Heidi Hamilton in front of customers and her subordinates, that he would birate female managers, including Heidi Hamilton, in front of their coworkers and in front of customers, but yet he never did such conduct to male managers in the store. There was testimony that Barry Davidson's harassment would drive Ms. Hamilton to the point of tears upon his visits, and Barry Davidson admitted to it. Yeah, I drove her to tears. Now, this isn't conduct that is appropriate, and it is sex-based conduct. He didn't treat males in this fashion. He didn't, not a single male manager had their bonus reduced. And when you look at the bonus reduction and the formula that's used, it is only the subjective, Barry Davidson's subjective opinion that is used to reduce Heidi Hamilton's bonus. All of the objective numbers, her customer survey satisfaction scores, her profitability of her store, she was the most profitable store in the entire chain of the great indoors. All of her hard numbers indicate she was the best manager they had. She got an award for it. But there was also evidence that she had the worst write-off merchandise in TGI, that she missed significant opportunities given the expanding home improvement in Las Vegas, weren't there, and the fact that the financial performance of the stores was only counted for half of their evaluation. Your Honor, first of all, as far as the evaluation score, it counts as 60 percent and not — I'm sorry. Just as a correction. And that's why I'm saying it was Barry Davidson's subjective scores that brought those scores down. As far as things like taking advantage of the home improvement market, that was a subjective observation by Barry Davidson, yet Ms. Davidson's — Ms. Hamilton submitted evidence to show that she obtained free advertising by participating in a magazine to get her store publicity for free. So she was doing these types of marketing things, and there is evidence in the record that contradicts Barry Davidson's testimony. What is most intriguing is the fact that Barry Davidson, in his deposition, says that he was not only basing this on his personal observations, but that he received complaints from other people, and that's why he had these negative opinions. But yet when asked to produce that evidence in discovery, Sears produced nothing. There was absolutely no complaints from anybody else ever produced by Sears. And when Barry Davidson's supervisors were deposed, both of them had visited Ms. Hamilton's store, and neither one of them could personally recall anything negative to say about Ms. Hamilton at their visit. And Mr. Buxton's deposition, his only negative comments were based upon what he had been told by Barry Davidson. What Sears's case stands at this point is Barry Davidson. Sears has absolutely nothing else to support or substantiate its case other than the word of Barry Davidson and what Barry Davidson created on paper. None of the business records support him. None of the witness testimony supports him. But yet on Ms. Hamilton's side, not only does she have support in the business records that she was doing her job and doing it properly, but she has the support of independent witnesses that, yes, she was doing her job. Even when you look to the president of the company, the great indoors, and you look to Barry Davidson's supervisor, they said, yeah, we visited the store, we don't have anything negative to say. Now, these are people who no longer work for Sears, who are under confidentiality agreements and are bound by those agreements, yet they still couldn't come out and say they didn't have anything negative to say about Ms. Hamilton. This was a case of summary judgment. And the issue in this case are factual, and that's where the problem lies, is these are issues of material fact, these are issues of witness credibility, and those are issues that are meant to be for the trier of fact, not a judge. And the district court should never totally ignore evidence completely, as they did in the case of Irma Hill's testimony. Okay. You may be at a point where you might want to reserve. You said you wanted about five minutes. I wanted to reserve three minutes for rebuttal. I would like to touch on two other issues that are on appeal, Your Honor, that being the retaliation claim. It is not the retaliation claim should not be dismissed for failure to exhaust administrative remedies, Your Honor. When you look at the claim itself, Ms. Hamilton states in the actual charge that she had made complaints to HR and she was treated negatively thereafter by virtue of negative things in her personnel file, reduction of her bonus, and ultimate termination. The Ninth Circuit in BKB versus Maui PD specifically held that charges of discrimination are supposed to be construed broadly. And when you look at the investigative letter by Al-Pashan that is part of the record in this case, he even indicates that Ms. Hamilton had complained to Human Resources and that she was complaining about adverse treatment thereafter. Clearly, the retaliation claim was part of the EEOC charge, and Ms. Hamilton should not be penalized because Maurice Davis of the Nevada Equal Rights Commission forgot to check a little box on the form. The record is clear and indicates that those charges were investigated with regard to that, those issues. With regard to the ---- Was there evidence that Davidson knew about the complaints that she had filed against him? Yes, Your Honor. It's right in her actual written ---- her actual affidavit in support of her charge of discrimination. Ms. Hamilton said that she complained to HR and that, as a result, she had negative information put into her personnel file, her bonus was reduced, and she was ultimately terminated from her employment. So those issues were brought forth and they are part of her original charge. The question was evidence that Davidson knew of the charge. Maurice Davidson? Yes, Your Honor. That was the NERC officer who accepted Ms. Hamilton's original affidavit that she signed in his presence. So, yes, I would assume he would have read it when he was the accepting officer from the Nevada Equal Rights Commission. It was later investigated by EEOC. Her immediate supervisor was Barry Davidson? Oh, yes, Your Honor. I'm sorry, I misunderstood. Yes, Barry Davidson admitted that he knew that there was at least one charge. He admitted in his deposition testimony that there was at least one complaint made against him. That was an admission he made in his deposition. And what's interesting is Sears maintained no records of any complaints that Ms. Hamilton made, including the complaint that Barry Davidson admitted he knew about. Nor was there any evidence that Sears ever investigated any of Ms. Hamilton's complaints. With regard to the Cobra claim, Your Honor, there are multiple errors by the district court. First and foremost, the district court in the issue of the damages inappropriately looked at a hearsay affidavit, which is not admissible evidence. It was timely objected to by the plaintiff as being a hearsay affidavit, and it was requested to be stricken. Yet the district court still considered the hearsay affidavit, which was the only submission that negated her request for damages in this case, and it was not admissible. With regard to the request for attorney's fees, the district court denied the plaintiff's request for attorney's fees on the Cobra award. However, they failed to do any type of analysis under the five factors that this Court has determined is necessary to make a determination. The district court was completely silent as to its reasoning and the explanation. And if you look at the five factors, bad faith, ability to pay, detrimental effect of the award, the party seeking a fee sought to benefit to all planmetters and the relative merit of the party's positions, I think those factors do weigh in favor of the plaintiff because Sears has never given any explanation for their failure to provide the Cobra notice other than we forgot. And they say, well, but we paid the insurance. Well, Ms. Hamilton had no way of knowing that they were paying the insurance. She never benefited from them paying the insurance. And, in fact, she was detrimentally affected by the fact because she went on Cobra coverage. She went on to a benefit plan from her boyfriend, which was out of California. And, unfortunately, living in Las Vegas, there was no planned providers, so that she was denied regular routine medical care that she would normally receive if you had access to in-plan providers locally, which she did not. How do you determine damages? Yes, Your Honor. That was submitted to the district court. The damages were not significant. They were slightly over $3,000. And those damages were submitted. And they were based on what that she went to? And she had to pay more for the doctors that she went to? They were based upon her expenditures having to pay for the plan in California and the extra taxes that were incurred because, as a cohabitant plan, that those benefits are taxed, in addition to out-of-pocket expenses that she ended up having to pay that she would not have normally had to pay had she been able to go to a regular doctor. And those were submitted to the district court through an affidavit that was actually based upon personal knowledge and not based upon hearsay. You're over your time. Thank you, Your Honor. Thank you for your argument. We'll hear from Sears this time.  Good morning. May it please the Court. My name is Holly Robbins, and I'm here on behalf of Sears, the great indoors. Do you agree that this is a termination case? I don't, actually. The plaintiff quit. Did she actually ever resign? Yes, she did. She said that she was – she stopped coming to work. She turned in her keys. She said that she wanted a severance package. She was offered a severance package. She didn't sign anything that said I quit, but she never returned to work. And when plaintiff's counsel says that she asked to return to work, it wasn't she who did that. It was her counsel who did that. What difference does that make? Well, I think it makes a difference because there were caveats along with the I want to return to work, I want to return to work, and I want my bonus reinstated, and I want this, that, and the other thing. It wasn't just I want to come back, I'll be there tomorrow. So can she show up tomorrow morning? At that point, they had actually replaced her because she had let them know. So the answer is no. So the answer is no. One way or another, you discharged her. But she had told them that she was not going to be returning to work, and that's why she was replaced. And she knew she was replaced. She said in her deposition, I knew that somebody else was coming. I wanted to leave things in good shape for them. I worked out my last day, and then I didn't like the severance offer that I got. So I submit that she quit. Do you agree with the timing sequence here, that is, that she turned in her keys before the formal severance offer was made? I believe that's true, yes. And when she received it, she was disappointed in it. True. Sought counsel, and counsel demanded that she be reinstated. Right. And that her or actually gave three different options, one of which was reinstatement with her, with her bonus. Did she respond to counsel's letter? Yes, I believe they did. And what did they say? I think they said no, that she was offered the severance that she was offered, and she could accept it or not accept it. But what were the consequences of not accepting it? The consequences of not accepting it were that she no longer worked there and she didn't get any severance. In other words, she was fired if she didn't accept it. No, she had already quit. So she wasn't fired. She had already quit. No, but I mean, you say, okay. I mean, the other side of the coin is if she didn't accept the severance package, you say, okay, I'm going to go back to work. But that's not an option that was given her. That was not an option at that point. And she knew that because she knew someone else was coming in to take her place. She knew that the ball had been set in motion. And there is case law, and it's in the briefing, about an employer not having to go back and say, okay, fine, you unresigned, we'll take you back. Was she or was she not told that before she could learn of the severance offer, she had to turn in her case? I believe she was. Well, no, actually, I don't think that there was any direct conversation about that. I'm not aware of any kind of conversation of that in the record, that you have to return in your case. I'm not saying there's necessarily anything wrong with that. Yeah. It may have been that Sears was saying severance occurs when you've decided not to work anymore. You have to make that decision, and then we make the offer. But you agree with the basic time sequence. I do, yes. Okay. Yeah, I do. All right. There are ---- Does it really make a difference in your case whether ---- let's assume for the sake of the argument that really Sears intended to terminate her. Does that make a difference in your case? Well, it does because there ---- I think it does maybe damages-wise if the case were to go forward. But whether she quit or whether she was ---- whether her employment was terminated, I think Sears had good reason to terminate her employment and had ---- which has been shown in the record, if it indeed did that. Part of which was she said, I don't want to work here anymore. I don't like it. And even just that is enough for an employer to say, okay, you don't like it? Then let's move you out of your position. And she has ---- what she hasn't done is shown that her not working there, that any reason for her not working there is pretextual. There is no evidence in the record that Sears' reasons for any of the actions that it took against her were pretextual. Counsel says her store was among the most profitable, if not the most profitable. Is that right? Yes, that's true. And there's no dispute on that. There's no issue of pretext regarding that. That is not the reason that Sears has said that she got a lower bonus or really or that her employment ended or anything like that. She had ---- her store was among the most profitable. On the other hand, there were a number of issues that were addressed with her over the course of a full year and a little bit more than a year regarding her performance, including her leadership skills, including her ---- the issues that Judge Corman had mentioned earlier with the write-offs, including some unprofessional conduct, such as asking people to or asking a particular employee to run a personal errand for her, showing up in the workplace in unprofessional clothing. And as well, you know, she has mentioned the issue of, well, I had really good customer service scores. But if you look at her customer service scores, those fell every single quarter that she worked there. Every quarter they went down in 2004. Jerry Davidson was her immediate supervisor? That's correct. It's clear he didn't like her. I think that ---- I think it's fair to say at some point he didn't. He testified that when she started working there, he really wanted her to succeed. And part of the reason for all of the counseling that he did for her was to help her to succeed in her job. That if he gave her specific guidance, which he did, that that would help her to succeed. He extended her probation so that she would have extra time to succeed. And he wanted to help her. Now, it seems that there maybe have been some personal just ---- and I wouldn't even say dislike, but they didn't like each other extremely much. They weren't friends with each other. But Mr. Davidson did work with her consistently throughout her employment to try to help her be a successful manager of that store. By telling her he'd be very happy if she got another job? Well, that was a year into him counseling her repeatedly, providing her counseling with e-mails, sitting down with her and giving her performance guidance. He also ---- he sent her to a mentor that he thought would be helpful. I think his name is Howard Hiley. Ms. Hamilton actually objected to that because Mr. Hiley is a man. Mr. Davidson wanted her to go to him because he was very experienced and had mentored people successfully in the past. So really not to send her to Mr. Hiley could have been seen more as a discriminatory action to say, no, you must go to a woman because you're a woman is not an appropriate way to mentor someone or to select a mentor. How many stores did Mr. Davidson supervise? I believe there were 17. And how many of them were managed by women? Three. And what was any evidence in the record about how the other two were treated? Yes, actually. There is evidence that they were treated just fine. He respected them quite a lot. They were good managers. He was happy with their performance. There's also some evidence in the record that there was ---- Correct. Yes, that's true. So he worked just fine with those other two managers. One of the things that Ms. Hamilton said a few times in her deposition was that, in her opinion, he didn't like her personally, that if it had been anybody else, not any other, any man, but anybody else, the situation would have been different. Now, I'm not saying that's good or fair, but it's not discriminatory if they had some kind of, you know, personal issue where they weren't getting along. And that's not evidence of any kind of discrimination against her because of her gender, particularly given that there were other women that he got along with just fine. Ms. Plaintiff has pointed out the testimony of Ms. Hill. I think one of the reasons why the district court ignored that testimony is because it's opinion and because Ms. Hill doesn't know and doesn't have anything that she can say about how Mr. Davidson treated other managers because she wasn't in the other stores with the other managers. So the testimony is really all her opinion and doesn't get us anywhere in terms of material evidence. There's no evidence here of any inappropriate behavior comments or gender-based comments by Mr. Davidson. Ms. Hamilton's argument really is based on her own opinion. She seems to believe that any negative action taken toward her, any, even any minor slight, like not immediately writing down her ideas, must be based on her gender. But, you know, in sort of in counterpoint, Ms. Hamilton actually terminated the employment of a female employee, and I certainly don't think that she would think that that was just because of that person's gender. Not every action that's negative has to be because, I mean, it's not a, does not follow logically, I'm a woman, I was fired, therefore it must be because I was a woman. Ms. Hamilton's performance issues are very well documented, and it wasn't just Mr. Davidson who had issues with her. Now, there may not be a ton of evidence about Mr. Buxton's opinion or Ms. David's opinion, but both of them spoke of her being, seeming unprofessional, and of them not being particularly impressed with her. And so rather than the, Ms. Hamilton's opinion that Ms. David, or Ms. Hamilton was well-liked by anybody else other than Mr. Davidson, we have evidence in the record that indeed other people saw her as being unprofessional, that she really didn't make a great impression. And Mr. Buxton also said not only was he looking at Mr. Davidson's opinion and his own evaluation of Ms. Hamilton, but he also looked at a number of records. And those are set out in his deposition testimony, which is cited and quoted in our briefing. This is really a case, I think, that follows this Ninth Circuit and other Federal court line that courts do not sit as a super-personnel department. In this case, we have a plaintiff who didn't like the criticism her supervisor gave her, and that's no big surprise. It's human nature. People don't like to be criticized. And she complains of a number of sort of minor employment issues, like that Mr. Davidson didn't write down her comments, or that he chose a man to do a presentation, or that he told her that she wasn't managing the store. But that's Mr. Davidson's job. If he doesn't see a manager managing her store, Mr. Davidson needs to tell that person. Do you agree that in denying attorney's fees and costs on the Cobra claim that the district court failed to go through the HUML factors? I don't know that it's actually in the opinion, but I think the factors support the district court's discretion to deny the attorney's fees and the punitive damages. The question is not related to punitive damage. The question is related to the entitlement to fees and costs under ERISA for what happened in connection with Cobra. And our case law since 1980 has required the district court to go through this five-step analysis. And if the district court may have gone through the five-step analysis, but I don't believe that it is fully stated in the district court's opinion. However, I do think if you go through that five-step analysis, it supports the district court's discretion to deny the attorney's fees. Is there a dispute as to the amount of fees? Is it just a question of entitlement in your view, or did you also dispute the fees that were sought? We would dispute the fees, but I don't know what – I don't know that those were ever set forth by the plaintiff what fees they were seeking. But in looking at that analysis, not only is there no bad faith here, there's no dispute that this was a simple mistake. And the company really penalized itself in its mistake because it paid for her Cobra continuation, paid the full amount of the premiums for more than a year. So more than $5,000 it paid for those premiums. Now, she paid less than that for the premiums. And actually, she didn't pay anything. Her fiancé paid less than that for the premiums and for the taxes on the insurance that was bought by her fiancé on her behalf. So really she didn't – she wasn't out any money. And I would submit that it's not going to help to make the company actually provide the notice in the future to levy attorneys' fees and costs, because obviously they don't want to do this because they ended up paying more money than they would have ever needed to. Okay. Thank you, Your Honor. Thank you. Would you like 30 seconds for rebuttal? Yes, Your Honor. Your Honors, the evidence is clear that Barry Davidson did single Miss Hamilton out. And that singling out was sex-based, as also supported by the testimony of Irma Hill, who based her – it was not opinions, it was her actual physical observations of Barry Davidson's treatment of Miss Hamilton in the store, as well as Mr. Davidson's desperate treatment between the male department managers versus the female department managers in that store. So Miss Hill was an actual witness, an eyewitness, to that desperate treatment. Okay. That's 30 seconds. Thank you. The case just argued will be submitted for decision, and the Court will stand in recess for the day.
judges: Korman, Hawkins, Thomas